*366
 
 OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This parental rights termination case raises several issues regarding New York’s implementation of the Adoption and Safe Families Act. The issues arise in the context of proceedings against respondents Raquél T. and Marino S., parents of Vivian S. (born February 8, 1993) and Marino S., Jr. (born September 25, 1995). Raquel is also the mother of Shaina T. (born April 5, 1989). Raquel and Marino were not legally married, but lived together with the three children.
 

 The following facts are excerpted from the well-reasoned, comprehensive opinions of the Family Court (181 Mise 2d 264 [1999]) and the Appellate Division (293 AD2d 223 [2002]) terminating respondents’ parental rights.
 

 On July 31, 1997, Raquel was asleep with her son in the living room of her apartment, when Marino went into the bedroom and raped Shaina, then eight years old, while Vivian, then four, slept in the same bed. Raquel awoke when Shaina emerged from the bedroom holding herself tightly and bleeding from her vagina. Raquel watched as her daughter took a shower, then wrapped the child in two towels and placed her on the bed. Raquel put a sanitary pad on Shaina but the bleed
 
 *367
 
 ing continued. Instead of seeking immediate medical attention, Raquel acquiesced in Marino’s suggestion that they wait. Before long, however, Shaina, complaining of stomach cramps and continuing to bleed through the towels, began to vomit.
 

 After finally deciding to seek medical treatment, Raquel and Marino began to fabricate the story that the child, while getting out of bed, had been injured by falling over a chair and being struck between the legs. As Shaina continued to bleed profusely, the couple concocted a story to conceal that Marino had been present in the apartment. Raquel knew of a previous allegation that he had sodomized the child, resulting in an investigation by the Administration for Children’s Services (ACS) (181 Mise 2d at 269). She also knew that her own mother had previously accused Marino of sexually abusing Raquel’s young sister, resulting in his arrest
 
 {id.).
 

 [1]
 

 Raquel agreed to report falsely that Marino had been at his mother’s house when Shaina was injured, not in the apartment with her.
 

 Raquel next spent a period of time putting away the mattress on which Marino slept, mopping the floor and washing up the blood. Approximately two hours after she first became aware of Shaina’s injury, Raquel called for a taxicab and left with her children. Although she had previously taken the children to Metropolitan Hospital, which was closest to the family’s home on East 118th Street in Manhattan, and although there were many other hospitals along the route, Raquel directed the cab to take them to a clinic on East 3rd Street and Avenue C — 115 blocks away. Suffering from severe internal injuries and extensive blood loss, the child was rushed from the clinic to Bellevue Hospital, where, listed as “likely to die,” she underwent surgery to repair the lacerations to her vaginal wall. Shaina remained hospitalized for nine days.
 

 Informed by the police that Marino had confessed to raping Shaina, Raquel — seated in a police car with Marino to be transported to court — leaned over and kissed him, telling him that she would meet him later at his mother’s house (181 Mise 2d at 269-270). The three children were placed in foster care
 
 *368
 
 on August 1, 1997, the day after the rape. Marino ultimately pleaded guilty to rape in the first degree and was sentenced to 15 years in prison. Raquel pleaded guilty to reckless endangerment in the first degree based on her failure to seek help for Shaina and her false statements about the cause of the injuries, and on January 16, 1998, was sentenced to one-to-three years in prison.
 

 Proceedings Below
 

 A central issue before us is whether diligent efforts to reunite respondents with the children, concededly not undertaken by the foster care agency, were required. As the applicable statutory law changed midstream — after the filing of abuse and termination proceedings, but before their conclusion — we now recount the provisions and their relevant amendments, in relation to the proceedings below.
 

 Initiation of Family Court Proceedings. Proceedings were filed in Family Court both for abuse and for termination of parental rights. Child abuse proceedings were instituted against the respondents on August 1, 1997, resulting, on May 11, 1998, in findings of abuse as to Shaina and derivative findings as to the other two children. Subsequently, on October 22, 1998, Family Court entered orders of disposition placing the children in the custody of ACS for one year. In September 1998 (with the underlying abuse proceedings still pending) petitions to terminate respondents’ parental rights were filed, based on allegations of permanent neglect
 
 (see
 
 Social Services Law § 384-b [4] [d]; [7] [a]).
 
 [2]
 

 Abuse proceedings have long been governed by Family Court Act article 10. As a rule, when a child has been removed from the home based on alleged abuse or neglect — as these three children were — the social services official responsible for the child must attempt to reunite the child with the birth parent; this includes efforts at rehabilitation so as to render the parent capable of caring for the child
 
 (see
 
 Family Ct Act § 1052 [b] [i] [A]; § 1055 [c]). Such efforts typically include facilitation of
 
 *369
 
 parent-child visits and provision of services to the parent, including assistance with housing, employment, counseling, medical care and psychiatric treatment
 
 (see
 
 Family Ct Act § 1055 [c]).
 

 Similarly, in termination of parental rights proceedings (governed by Social Services Law § 384-b) a foster care agency generally must demonstrate that diligent efforts at reunification have been undertaken. Such efforts are not required, however, where they would be detrimental to the best interests of the child
 
 (see
 
 Social Services Law § 384-b [8] [a] [iv]). These provisions implement New York’s strong public policy of both keeping families together and protecting the health and safety of children
 
 (see
 
 Social Services Law § 384-b [1]).
 

 The New Statute. In February 1999, during the pendency of the abuse and termination proceedings, New York passed the Adoption and Safe Families Act (ASFA) (L 1999, ch 7). The Legislature thereby brought New York into conformity with a 1997 federal law of the same name, maintaining the State’s eligibility for federal funding for foster care services.
 
 [3]
 
 ****8 New York’s ASFA overlays numerous provisions of the Social Services Law, Family Court Act and Domestic Relations Law, adding to the tangle of cross-referenced provisions. In addition to particular amendments, ASFA made explicit our law’s constant concern for prompt permanency in a child’s life, going so far as to set time frames for termination proceedings
 
 (see
 
 Social Services Law § 384-b [3] [Z]).
 

 Soon after New York’s passage of ASFA, the petitions to terminate respondents’ parental rights were amended to add causes of action for “severe abuse” pursuant to newly amended Social Services Law § 384-b (4) (e) and (8), including a cause of action for severe abuse based on the commission, or knowing allowance of the commission, of a felony sex offense
 
 (see
 
 Social Services Law § 384-b [8] [a] [ii]). Simultaneously, a motion was brought in the underlying abuse proceeding for a finding of “aggravated circumstances,” another term introduced by ASFA
 
 (see
 
 Family Ct Act § 1012 [j]). The effect of a finding of ag~
 
 *370
 
 gravated circumstances under the Family Court Act — like the effect of a finding of severe abuse under the Social Services Law (severe abuse itself constitutes an aggravated circumstance) — is to dispense with the requirement that an agency responsible for having placed the children in foster care or seeking to terminate parental rights exercise diligent or reasonable efforts to reunite the respondent with the children
 
 (see
 
 Family Ct Act § 1039-b [b] [1]).
 

 At a Family Court hearing respondents were given a full opportunity to present evidence in support of their contention that diligent efforts to reunite them with their children should be required. Family Court thereafter found that Shaina was severely abused, based on
 
 first,
 
 the rape by Marino and the knowing allowance of it by Raquel
 
 (see
 
 Social Services Law § 384-b [8] [a] [ii]) and
 
 second,
 
 acts — arising from respondents’ failure to aid the child after the rape — committed under circumstances evincing a depraved indifference to human life which resulted in serious physical injury
 
 (see
 
 Social Services Law § 384-b [8] [a] [i]). Family Court further found that Vivian and Marino, Jr. derivatively were severely abused; concluded that diligent efforts at reunification were not required; and terminated respondents’ parental rights. The Appellate Division affirmed, as do we.
 
 [4]
 

 Retroactivity
 

 Respondents challenge the retroactive application of ASFA to their pending proceedings insofar as their termination petitions were amended to include a cause of action for severe abuse based on a felony sex offense. Family Court, affirmed by the Appellate Division, correctly determined that ASFA should be applied retroactively.
 

 Generally, nonprocedural statutes “are not to be applied retroactively absent a plainly manifested legislative intent to that effect”
 
 (People v Behlog,
 
 74 NY2d 237, 240 [1989], quoting
 
 People v Oliver,
 
 1 NY2d 152, 157 [1956]). When a statute creates a new “right of action,” it is presumed that the Legislature intended the statute to be applied prospectively only, unless a contrary intent clearly appears
 
 (Matter of Duell v Condon,
 
 84 NY2d 773, 783 [1995], citing
 
 Jacobus v Colgate,
 
 217 NY 235, 240-242 [1916]). Ameliorative or remedial legislation, however,
 
 *371
 
 should be given retroactive effect in order to effectuate its beneficial purpose (see
 
 Matter of Gleason [Michael Vee, Ltd.],
 
 96 NY2d 117, 122 [2001]). ASFA was enacted to bring New York into compliance with the federal statute, which by its terms applies to all children in foster care on the date of its enactment.
 

 Most importantly, “the reach of the statute ultimately becomes a matter of judgment made upon review of the legislative goal”
 
 (Matter of OnBank & Trust Co.,
 
 90 NY2d 725, 730 [1997], quoting
 
 Matter ofDuell,
 
 84 NY2d at 783). ASFA makes explicit that in exercising reasonable efforts to reunite children with their birth families, “the health and safety of children is of paramount importance”
 
 {see
 
 Social Services Law § 384-b [1] [a]). This language, derived from the federal statute, is fully consistent with “the existing law in New York that the health and safety of the child were always the paramount concern in providing reasonable efforts to prevent placement and promote reunification. It does not represent a change in law, policy or emphasis in New York” (Mem of Assembly in Support, 1999 McKinney’s Session Laws of NY, at 1487). Rather, as the Appellate Division explained, ASFA serves simply to expedite permanency planning for abused children by enabling the agency to obtain an immediate determination — during the underlying abuse proceeding — of whether it must exercise diligent efforts, without first having to expend considerable effort in preparing an obviously unfit parent for permanent placement until a ruling can finally be sought in the subsequent termination proceeding (293 AD2d at 228).
 

 Because the statute is remedial in nature and does not impair vested rights, it should be applied retroactively. As Family Court recognized, ASFA “is merely an attempt to refine the law concerning permanency planning for children in foster care so that New York law more fully and expeditiously accomplishes its preexisting goals” (181 Mise 2d at 273). Nor does ASFA or its retroactive application violate respondents’ constitutional due process rights. The law provides for a procedure by which the parent is entitled to offer evidence to contravene the agency’s request to be excused from reasonable efforts at family reunification (Family Ct Act § 1039-b; Social Services Law § 384-b [8] [a] [iv]). Here, Marino offered no evidence whatsoever, and Raquel’s evidence was determined by Family Court to be insufficient.
 

 
 *372
 
 Diligent Efforts
 

 The retroactivity of ASFA is significant in this case as it affects the agency’s obligation to exercise diligent efforts to reunite respondents with the children.
 

 It has long been the public policy of this State to keep biological families together and to require foster care agencies to exercise diligent efforts to reunite abused and neglected children with their birth parents, once rehabilitated
 
 (see
 
 Social Services Law § 384-b [1] [a] [ii], [iii]). That critical goal remains, and careful attention must be paid to ensure it is achieved where possible. But when a child’s best interests are endangered, such objectives must yield to the State’s paramount concern for the health and safety of the child. In such extreme cases, the State’s strong interest in avoiding extended foster care limbo and expediting permanency planning may properly excuse the futile exercise of making efforts toward reuniting a family that, in the end, should not and will not be reunited.
 

 Despite respondents’ claim to the contrary, the admissible evidence adduced before the Family Court clearly and convincingly established that diligent efforts to reunite this family were not required
 
 (see
 
 Social Services Law § 384-b [3] [g]). In light of the heinous acts perpetrated by Marino on Shaina, and the utter disregard for the child’s life exhibited by both respondents, the contention that the Family Court erred is devoid of merit. The affirmed findings that Shaina’s health and safety have been — and would continue to be — jeopardized by respondents’ abuse are amply supported by the record, including evidence of delay in getting help and lies about the cause of injury, which placed the child’s life in grave danger.
 

 Nor do Family Court’s findings rest on inadmissible hearsay, as respondents contend. Rather, the nonhearsay evidence before the trial court was more than sufficient to meet the agency’s burden. Although some hearsay evidence was admitted, it was offered not for its truth but rather to explain the agency’s decision not to undertake reunification efforts, and was elicited only after respondent father called into question the basis of the agency’s determination.
 

 Respondents further urge that, even if it has retroactive effect, ASFA may not be applied “retrospectively,” an argument that spotlights the three highlighted words of the following amended Family Court Act section:
 

 “§ 1039-b. Termination of reasonable efforts
 

 “(a) In conjunction with, or at any time subsequent
 
 *373
 
 to, the filing of a petition under section ten hundred thirty-one of this chapter [proceeding to determine abuse or neglect], the social services official may file a motion upon notice requesting a finding that reasonable efforts to return the child to his or her home are
 
 no longer required”
 
 (emphasis added).
 

 According to respondents, the Family Court — in entertaining a motion pursuant to Family Court Act § 1039-b — was empowered only to determine the need for
 
 future
 
 efforts, and could not excuse the agency’s failure to exercise diligent efforts until the moment of the 1039-b finding. We disagree.
 

 Such a construction of the statute would be at odds with the remedial nature of ASF A. Even before the enactment of ASF A, a court could, in the context of a finding of severe abuse, excuse an agency from showing that it had exercised diligent efforts when such efforts would be detrimental to the best interests of the child. Indeed, in this case Family Court, in addition to finding — pursuant to Family Court Act § 1039-b — that diligent efforts were not required, also made a finding — pursuant to the pre-ASFA portion of Social Services Law § 384-b (8) (a) — that such efforts would have been detrimental to the best interests of the children. As the Appellate Division noted, “[i]t would be an absurd result to require reasonable efforts until a judicial determination is made when the [statute] itself recognizes that there are situations where reasonable efforts may actually be harmful to the child” (293 AD2d at 229).
 
 [5]
 

 Derivative Findings of Severe Abuse
 

 Respondents additionally challenge Family Court’s authority to make derivative findings of severe abuse as to the two children who were not victims of the rape. Article 10 of the Family Court Act, which pertains to child protective proceedings, is
 
 *374
 
 silent with respect to derivative findings of abuse. Respondents concede, however, that indirect support for derivative findings in article 10 proceedings may be found in the evidentiary rule set forth in Family Court Act § 1046 (a) (i), which provides that “proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the legal responsibility of, the respondent.”
 

 Over the years, courts have consistently sustained derivative findings where a respondent’s abuse of the subject child is so closely connected with the care of another child as to indicate that the second child is equally at risk
 
 (see e.g. Matter of Dutchess County Dept. of Social Servs. v Douglas E.,
 
 191 AD2d 694 [2d Dept 1993];
 
 Matter of James P.,
 
 137 AD2d 461 [1st Dept 1988]). As Family Court articulated the standard, with which we agree, derivative findings of severe abuse may be “predicated upon the common understanding that a parent whose judgment and impulse control are so defective as to harm one child in his or her care is likely to harm others as well” (181 Misc 2d at 276 [citation omitted]). It is additionally clear that children who are not themselves the direct targets of abuse may, in accordance with the proof, suffer damage from witnessing the severe abuse of their siblings
 
 (see generally Matter of Kasey Marie M.,
 
 292 AD2d 190 [1st Dept 2002]) or their nonoffending parent
 
 (see Matter of Lonell J.,
 
 242 AD2d 58 [1st Dept 1998];
 
 Siesto v Lenox Hill Hosp.,
 
 167 Misc 2d 918 [Sup Ct, Kings County 1996]). Here, the four-year-old sibling was in the same bed while Marino raped Shaina.
 

 Respondents insist that there is no statutory authority for derivative findings because, while siblings are mentioned in some of the Social Services Law subparagraphs, they are not explicitly mentioned in the particular statutory subparagraphs at issue here. Social Services Law § 384-b (8) (a) (iii), for example, specifically defines a severely abused child as including a child whose parent has been convicted of the homicide of the child’s sibling, or the attempted homicide of the child or the child’s sibling, or the assault or attempted assault of the child or the child’s sibling. This subparagraph plainly contemplates derivative findings as to a sibling. Anomalous though it may seem, however, this subparagraph was not triggered in the present case because the conduct at issue was violent rape causing life-threatening injuries, and not homicide or assault. Social Services Law § 384-b (8) (a) (i) — which is at issue here, and does not explicitly mention the subject child’s sibling— defines a severely abused child as a child who has been found
 
 *375
 
 to be abused as a result of reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life, which result in serious physical injury to the child.
 

 We conclude that an underlying finding that a child was abused may itself be derivative, even in cases other than those involving homicide or assault. Social Services Law § 384-b (8) (a) (ii), also at issue here, defines a severely abused child to include a child who has been found to be abused (under Family Ct Act § 1012 [e] [iii]) as a result of the parent’s actions, provided that the respondent must have committed (or knowingly allowed to be committed) a felony sex offense. The statute does not specify the person against whom the felony sex offense must have been committed. It does not explicitly state that the sex offense may have been committed against a sibling. But neither does it state that the sex offense must have been committed against the abused child herself.
 

 In making its derivative findings, Family Court properly construed the Social Services Law to permit a finding of severe abuse based on an abuse finding coupled with a felony sex offense against a sibling. We refuse to read the absence of specific references to siblings in subparagraphs (i) and (ii) — as respondents would have us do — to limit derivative findings strictly to homicide and assault situations. Both subparagraphs (i) and (ii) require a prior finding that a child was abused, which finding may itself be derivative, and thus contemplate derivative findings. In subparagraph (iii) — which makes no reference to underlying findings of abuse — specific references to siblings are necessary to make clear that it, too, may support derivative findings. It would be unthinkable to interpret the Social Services Law so that a derivative finding can be made when a parent assaults a sibling, but not when the parent rapes a sibling or seriously injures her under circumstances evincing a depraved indifference to her life.
 

 Finally, Family Court properly recognized that without derivative findings, a child who was severely abused (such that the foster care agency would thereby be relieved of its obligation to undertake diligent efforts at reunification) would be on a different permanency planning track from his or her sibling. New York child welfare law and policy favor keeping siblings together
 
 (see
 
 L 1989, ch 728, § 1; Social Services Law § 384-a [1-a]).
 

 Accordingly, the order of the Appellate Division should be affirmed, without costs.
 

 
 *376
 
 Judges Smith, Ciparick, Rosenblatt, Graffeo and Read concur.
 

 Order affirmed, without costs.
 

 [1]
 

 . Family Court detailed acts of abuse by both respondents perpetrated over the course of at least four years. For example, during Raquel’s interview by the police after Shaina’s admission to the hospital, Raquel told of separate prior incidents in which, she claimed, a young cousin and Shaina herself had each been climbing on a cabinet in Raquel’s home, fallen, been struck between the legs and suffered vaginal bleeding. On a previous occasion, when informed by Shaina’s godmother that Shaina had reported being sexually abused by Marino, Raquel slapped Shaina on the mouth and said, “Don’t he.”
 

 [2]
 

 . This case does not present the vexing issue of termination of parental rights of a domestic violence victim who is helpless to protect a child
 
 (see e.g.
 
 Sean D. Ronan,
 
 No Discretion, Heightened Tension: The Tale of the Adoption and Safe Families Act in New York State,
 
 48 Buif L Rev 949 [2000]). While Raquel interposed a defense in the termination proceeding that she was a victim of Marino’s abuse and powerless to protect Shaina, that claim was rejected by Family Court (181 Misc 2d at 274) and is not pressed in this Court.
 

 [3]
 

 . New York was the last of the 50 states to conform its law to the federal statute. ASFA has stimulated wide commentary (see
 
 generally
 
 Terry Lyons,
 
 When Reasonable Efforts Hurt Victims of Abuse: Five Years of the Adoption and Safe Families Act of 1997,
 
 26 Seton Hall Legis J 391 [2002]; Anne Crick and Gerald Lebovits,
 
 Best Interests of the Child Remain Paramount in Proceedings to Terminate Parental Rights,
 
 73 NY St B J 41 [May 2001]; Robert M. Gordon,
 
 Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997,
 
 83 Minn L Rev 637 [1999]).
 

 [4]
 

 . For approximately the past five years, the three children have lived together in the same preadoptive foster home.
 

 [5]
 

 . We reject respondents’ further claim that Family Court’s article 10 finding of aggravated circumstances after the commencement of the termination proceeding was untimely. Pursuant to the plain language of Family Court Act § 1039-b (a), a motion seeking a determination that reasonable efforts are no longer required based on a finding of aggravated circumstances may be made “[i]n conjunction with, or at any time subsequent to,” the filing of an article 10 proceeding. In any event, as Family Court correctly recognized, the motion pursuant to section 1039-b, while permissible, was superfluous here. Since the termination proceeding had already commenced, a finding of severe abuse under Social Services Law § 384-b (8) would itself have necessitated an inquiry into the appropriateness of diligent efforts and the extent to which they would be detrimental to the best interests of the children.